UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RIK LINEBACK, REGIONAL DIRECTOR OF ) <br> THE TWENTY-FIFTH REGION OF THE ) <br> NATIONAL LABOR RELATIONS BOARD, ) <br> FOR AND ON BEHALF OF THE NATIONAL ) <br> LABOR RELATIONS BOARD, ) <br> Petitioner, ) <br> ) <br> vs. ) <br> ) <br> FRYE ELECTRIC, INC., ) <br> Respondent. ) | 1:07-cv-0984-RLY-JMS |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND PROPOSED MEMORANDUM OF DECISION REGARDING PETITION FOR INJUNCTIVE RELIEF

This matter is before the magistrate judge on the National Labor Relations Board's (the "Board") Petition for Injunction Under Section 10(j) of the National Labor Relations Act, As Amended (Dkt. #'s 1, 8 and 23). Counsel for the Board moved to try the petition based upon the administrative record, to which the respondent stated it had no objection. The administrative record was filed with the Court, the matter has been briefed by the parties, and oral arguments were heard by the magistrate judge on November 13, 2007. Being duly advised, the magistrate judge recommends the injunction be granted for the reasons set forth below.

## I. Background[1]

Frye Electric, Inc. (the "Company") is an electrical contractor located in Avon, Indiana. Harold Frye ("Frye") is the founder, owner and president of the Company. Rick Miers ("Miers") is the vice president of operations and the number two ranking official in the Company. Gregory

---

[1] These facts come from the record of the ALJ's administrative hearing.

Wells ("Wells") is the director of operations.  Both report directly to Frye.  The Company has two types of operations in the electrical contracting field, residential and commercial.  Wells manages the residential division and Miers is in charge of the commercial side.

The other key players in the events at issue are Tom Fosnight ("Fosnight") and Dennis Hensley ("Hensley").  Fosnight was twice employed by the Company.  He was originally hired by the Company in April 2000 as a lead electrician, and remained in that position until December 5, 2005.  He was hired a second time as a lead electrician in June 2006.  As a condition of his rehire, Fosnight negotiated with Frye and Miers that he would not have to accept on-call assignments.  The Company has a rotating weekly schedule of employees to be available on-call after hours and on weekends for emergency service calls.  Approximately two months later, Hensley, a longtime friend of Fosnight, was hired as a helper.

In mid-to-late January 2007, Wells and Miers met with Fosnight to inform him that he would be required to participate in the on-call assignment rotation.  A second discussion occurred a week or two later.  Fosnight was scheduled for his first on-call rotation beginning March 23, 2007.

In February, Fosnight contacted the International Brotherhood of Electrical Workers, Local 481, (hereinafter the "Union"), and spoke with Steve Montgomery ("Montgomery"), a union organizer.  His purpose in so doing was "to see, you know, what kind of benefits and everything they had available.  If they had any job openings, as well."  (Tr. 130-131).  On February 21st, Fosnight met with Montgomery at the Union hall, where they discussed the Union's benefits and Montgomery gave Fosnight a booklet that outlines the Union's wages and fringe benefits.  Fosnight also completed an application form for membership in the Union, on which he indicated, regarding his current employment, that "I am having conflic[t]s with the

management making promises and going back on them." (GC Ex. 8, p. 2). Montgomery asked Fosnight to "speak to anybody else that may be interested . . . as going into the union as well as myself." (Tr. 133).

Two days later, on February 23rd, Fosnight and Hensley were in the Company's break room along with several other employees who were located a few feet away. Fosnight informed Hensley of what he had learned from his meeting with Montgomery and showed Hensley the booklet he had been given. Fosnight talked to Hensley about putting in an application at the union, and Hensley indicated he was interested in doing so.

The following Tuesday, February 27th, Fosnight and Hensley were assigned to work together. During the course of the day, management decided to fire both men. The testimony as to how this came about differed among those involved in the decision, Wells and Frye. Upon their return to the workplace at the end of the day, Wells first approached Fosnight and informed him of his termination, stating "[w]e feel that it's just best for us to part ways." (Tr. 106). As Fosnight left the facility, he encountered Hensley and informed him that he had been terminated. Hensley inquired as to the reason, and Fosnight told him that he wasn't given a reason. Hensley went in the facility to clock out and was approached by Wells, who told him "it's best we part ways." (Tr. 110). When Hensley pressed for a reason for his firing, Wells told him "let's just leave it as the best course to part ways." (Tr. 110-111).

While driving home after being terminated, Fosnight telephoned Miers and informed him of his termination. Fosnight testified that Miers "told me he had only learned about [it] five minutes previous to it and then asked me what was this about biding my time 'til the union called." (Tr. 136). Miers' testimony about the conversation differs substantially. He testified that Fosnight asked him what was going on and that he responded, "Tom, I don't know what's

going on yet.  I said, once I find out, I said I'll let you know." (Tr. 198).  Miers specifically denied making any reference to the Union.

The following day, Fosnight contacted Montgomery and advised him that he had been terminated, and related his version of the conversation with Miers.  Montgomery asked Fosnight to meet with Steve Dunbar ("Dunbar"), another Union official, to discuss his termination and the apparent reason behind it.  On March 1st, both Fosnight and Hensley met with Dunbar.  During the meeting, Hensley completed a Union application.  That form was apparently misplaced, so Hensley completed a second application on March 6th, on which he indicated that Fosnight was the person who had referred him to the Union.

On March 5, 2007, the Union filed a charge with the Board against the Company alleging that it had engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (3) of 20 U.S.C. § 158(a)(a) and (3), the National Labor Relations Act (the "Act").  An amended charge was filed on May 23, 2007.  On May 29, 2007, following a field investigation which permitted all parties to submit evidence, the Regional Director (the "Director") of the Board issued a complaint pursuant to Section 10(b) of 20 U.S.C. § 160(b) alleging that the Company had engaged, and is engaging, in unfair labor practices within the meaning of Section 8(a)(1) and (3) of the Act.  An administrative hearing on the complaint was held before Paul Buxbaum, Administrative Law Judge ("ALJ") for the Board on July 23, 2007, during which the parties presented evidence.

On October 19, 2007, the ALJ issued his decision and recommended order.  He found that the Company had engaged in unfair labor practices in violation of sections 8(a)(1) and (3) of the Act by the following conduct:

    1.    By discriminatorily discharging its employees, Thomas Fosnight and Dennis Hensley, the Company has engaged in unfair labor practices affecting commerce

>   within the meaning of Section 8(a)(1) and (3) and Section 2(6) and (7) of the Act.
>
> 2.  By coercively interrogating Thomas Fosnight about his protected union activities, the Company has also violated Section 8(a)(1) of the Act.

(ALJ's Decision, 2007 NLRB LEXIS 454 at *69).

The ALJ recommended that the Company cease and desist its unfair labor practices and to take certain affirmative action designed to effectuate the policies of the Act, including offering reinstatement to the discriminatorily discharged employees and posting a notice of the ALJ's decision at its facility. (ALJ's Decision at *75-77).

## II.  Discussion

Section 10(j) of the Act permits a district court to grant injunctions pending the Board's resolution of unfair labor practice proceedings. Section 10(j) relief should be granted "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." *NLRB v. Electro-Voice, Inc.,* 83 F.3d 1559, 1566 (7th Cir. 1996), (quoting *Szabo v. P\*I\*E\* Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir. 1989)), *cert. denied,* 519 U.S. 1055 (1997); *see also Id.* at 1567 ("the court's mission is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual").

In evaluating a Section 10(j) petition, the Court must determine whether the equitable relief sought is "just and proper." *29 U.S.C. § 160(j).* To establish Section 10(j) relief is just and proper, the Director must show: (1) a reasonable likelihood of success on the merits, (2) the labor effort would suffer irreparable harm absent an injunction, and that harm exceeds any irreparable harm suffered by the employer as a result of the injunction, (3) there is no adequate remedy at law, and (4) public harm would result absent an injunction. *Id.* at 1567; *see also*

*Bloedorn v. Francisco Foods, Inc.* 276 F.3d 270, 286 (7th Cir. 2001). The first, third and fourth of these must be established by a preponderance of the evidence. *Id.* at 1567-68; *Bloedorn,* 276 F.3d at 286-87. Irreparable harm must also be established by a preponderance of the evidence, but "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor . . . " *Bloedorn,* 276 F.3d at 286-87; *see also Electro-Voice,* 83 F.3d at 1567-68.

**A. Likelihood of Success on the Merits**

Section 8(a)(3) of the Act makes it unlawful for employers to terminate employees on the basis of their union activities. Determining the employer's motivation for terminating Fosnight and Hensley is essential in deciding whether their terminations violate the Act. *N.L.R.B. v. So-White Freight Lines, Inc.*, 969 F.2d 401, 406 (7th Cir. 1992). The Director must prove by a preponderance of the evidence that the terminations were "motivated by a desire to thwart protected activity." *Electro-Voice,* 83 F.3d at 1568, citing *Chicago Tribune Co. v. N.L.R.B.,* 962 F.2d 712, 716 (7th Cir. 1992). Once the Director meets his burden, the employer must then demonstrate by a preponderance of the evidence that the employees would have been terminated regardless of their union activity. *Id.*

In the context of a §10(j) petition, this Court does not have the jurisdiction to reach the merits of the Director's claims. *Id.* The Board will decide whether the Director has proven his case by a preponderance of the evidence. For §10(j) purposes, in determining the Director's likelihood of success, this Court must decide whether the Director has a better than negligible chance of success on the merits of his claim. *Id.,* citing *Kinney v. Int'l. Union of Operating Engineers, Local 150, AFLCIO,* 994 F.2d 1271, 1279 (7th Cir. 1993). As the parties have agreed, this decision will be made based on the administrative proceedings held before the ALJ.

The evidence in this case clearly demonstrates that the Director has a better than

negligible chance of succeeding on the merits.  Fosnight testified that the only substantial reason he was given for his termination came in a phone call to Miers, after the fact, wherein Miers inquired about Fosnight "biding his time 'til the union called."[2] (Tr. 136).  Otherwise, both Fosnight and Hensley were simply told at the time of their terminations that it was "best to part ways," without any further explanation.  (Tr. 106, 110-111).  Both men were terminated on the same day, four days after discussing Fosnight's meeting with the union representative in the Company's break room, with several other employees present and within earshot.

      The Company maintains that both Fosnight and Hensley were terminated for reasons other than their purported union activity.  However, the Director presented evidence to suggest that the Company's explanation is pretextual.  The proffered reasons for each employee's termination, as testified to by Wells and Frye, are inconsistent with information contained on their termination reports (which, the Court notes, were not completed until the day after their terminations, and never presented to either employee).  For instance, Wells cited bad attitude, refusal to take on-call duty, and tardiness as the reasons for Fosnight's discharge.  In describing Fosnight's attitude, Wells testified that it was "[p]oor.  He had a lot of things going on personally.  Staying on his cell phone all day.  Productivity.  Workmanship . . . Quality of work."

---

[2]While Miers denies making such a statement, the ALJ credited Fosnight's account of their conversation.  Significantly, the "Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces the Board that the ALJ is incorrect."  *Moran ex rel. NLRB v. Lafarge North America, Inc.,* 286 F.Supp. 2d 1002, 1013 (N.D.Ind. 2003).  While the Seventh Circuit has "declined to articulate any rule about the appropriate way in which to view the facts when evaluating a request for interim injunctive relief pursuant to section 10(j)," it has held that "when the district court decides the Director's request for 10(j) relief entirely on a paper record, we owe the Director a favorable reading of that record."  *Bloedorn,* 276 F.3d at 287.  Because this Court is deciding the request for 10(j) relief entirely on a paper record, and had no occasion to assess the credibility of witnesses or resolve conflicts in the evidence, it will similarly afford the Director a favorable reading of the record.

(Tr. 84). However, Fosnight's termination report rates his attendance as "good" and his quality of work as "satisfactory." (GC Ex. 5). Moreover, the reason for his termination is identified on the report as due to a "reduction in force." (GC Ex. 5). The report requires the preparer to circle the reason for termination and includes only three possibilities: quit, insubordination, or reduction in force. If one of the more significant reasons for Fosnight's termination was his refusal to take on-call duty, as Wells' and Frye's testimony indicated, then it would seem the more appropriate reason for his termination would be insubordination. In addition, there is no evidence in the record that Fosnight ever refused an on-call assignment, as he was terminated a month before he was even scheduled for on-call duty. These, along with several other inconsistencies, lend credence to the Director's theory of pretext.

Further, both Fosnight and Hensley's terminations appear inconsistent with not only the disciplinary policies described in the Company's handbook, but also the Company's self-professed lenience with respect to employee discipline. Wells testified that "we're pretty soft at heart," (Tr. 100) while Frye testified that "we tolerate a lot." (Tr. 37). Indeed, Fosnight was twice caught smoking marijuana in his company truck during his first period of employment with the Company. The second time he was suspended for five days, and then quit. (Tr. 65, 76). He was later rehired by the Company. (Tr. 81, 127-28). As noted by the ALJ, "This general practice of leniency and the past history of application of that practice to Fosnight and Hensley stands in stark contrast to their subsequent abrupt dismissals." (ALJ's Decision at *59).

Although not binding, the ALJ's decision is "relevant to the propriety of section 10(j) relief." *Bloedorn,* 276 F.3d at 288. "Assessing the [Petitioner's] likelihood of success calls for a predictive judgment about what the Board is likely to do with the case. The ALJ is the Board's first-level decision maker. Having presided over the merits hearing, the ALJ's factual and legal

determinations supply a useful benchmark against which the [Petitioner's] prospects of success may be weighed." *Id.*

The ALJ found in favor of the Director on both of the unfair labor practices allegations asserted in the complaint in a very detailed and thorough opinion. Based upon the Court's review of the administrative record and the ALJ's decision, the timing of the discharges coupled with the manner in which they were carried out and the inconsistencies noted above convince this Court that the Director has a far better than negligible chance of prevailing on the merits of the unfair labor practices alleged in the complaint.

## B.  Irreparable Harm and Balancing of Harms

The Court must next determine whether the labor effort will suffer irreparable harm absent section 10(j) relief and then determine whether such harm outweighs any harm to the employer if the injunction is issued.  *See Electro-Voice*, 83 F.3d at 1572.  In balancing the harm to the parties, "a strong showing as to the Director's likelihood of success will permit a weaker showing as to the balance of harms posed by the grant or denial of interim injunctive relief." *Bloedorn*, 276 F.3d at 298, citing *Electro-Voice,* 83 F.3d at 1568.

The Director argues that as a result of Fosnight and Hensley's discharge, the Union's campaign was stopped before it could even start.  Further, the remaining employees' exercise of their Section 7 rights has been chilled by the Company's actions.  The inevitable time delay before the Board's final decision on this matter will render any Board authority at that point meaningless, resulting in irreparable harm.

The Company contends that any union organizing campaign did not start until after Fosnight and Hensley's termination, and that both gentlemen were only seeking alternative employment with the union and had no discussions about organizing.  Since there was no

organizing activity going on at the time of discharge, there was no impact upon the remaining employees Section 7 rights, and no irreparable harm will result without an injunction.

At oral argument, counsel for the Company asserted that there was nothing in the administrative hearing record that rises to the level of demonstrating that either Fosnight or Hensley ever intended to pursue organizing for the Union. The Court respectfully disagrees. First, Fosnight testified that Montgomery asked him to "speak to anybody else that may be interested . . . as going into the union as well as myself," and "[s]peak with anybody else that was interested in joining the union. To speak with them." (Tr. 133). Second, as pointed out by the Director, Fosnight solicited Hensley to join the union. Thus, the Court concludes there is clear evidence in the record demonstrating that Fosnight intended to pursue organizing for the Union.[3]

The Court finds the Director's arguments persuasive, and in so doing, finds the following passage from *Electro-Voice*, 83 F.3d at 1573, to be instructive:

> As this case demonstrates, years may pass before the Board reaches the merits of the case. As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases. The "dischargees" will seek, and obtain, new employment. Their search may require them to move, or may lead them to a preferable job. Meanwhile, the employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them.

The employees at the Company have rejected attempts at contact by union representatives

---

[3] To the extent the record is ambiguous with respect to the organizational effort, the Court finds that said ambiguity should be construed against the Company, as it was the Company's conduct that created the uncertain situation. "[A]ny uncertainty and ambiguity regarding the status that would have obtained without the unlawful conduct must be resolved against the Respondent, the wrongdoer who is responsible for the existence of the uncertainty and ambiguity." *In re Campbell Electric Company Inc.*, 3 40 N.L.R.B. 825, 826 (NLRB 2003)

subsequent to Fosnight and Hensley's terminations (Tr. 183-85), supporting a strong inference that the unlawful discharge of Fosnight and Hensley has left them fearful it will happen to them. This is exactly what the Act is intended to prohibit, and precisely the irreparable harm an injunction is meant to prevent in the passage of time before the Board's final decision. The passage of time absent an injunction will decrease the union's ability to organize, as the employees' fears become further ingrained.

The Company also argues that because both men are currently employed,[4] the most likely remedy, should the Board uphold the ALJ's decision, would be back pay instead of reinstatement. Thus, no irreparable harm will result absent an injunction. The Director counters that if the Board affirms the ALJ's decision, both men would still have the opportunity, if desired, to be reinstated. The Director asserts that their re-employment does not undercut the need for injunctive relief, and in fact, an order of reinstatement is necessary to counter the message the Company sent by the firing of both men: affiliate with the Union and you will be fired, in violation of the Act. Early reinstatement will ensure such conduct is accompanied by timely consequences. An injunction will also protect the employees' right to choose whether to participate in the Union while employed with the Company, without fear of retaliation, which is the actual status quo.

While a damages award of back pay could be what ultimately occurs in this matter, it is not a foregone conclusion. Fosnight and Hensley, after all, may want their jobs at the Company back, regardless of their current employment. Their current employment may be at a less desirous company, with less pay or fewer hours. Certainly, loss of their jobs is not the sole

---

[4] At the oral arguments on November 13, 2007, both parties agreed to stipulate that both Fosnight and Hensley are currently employed.

harm suffered by Fosnight and Hensley. They, along with the remaining employees of the Company, should be restored to a position of knowing that they are free to pursue their rights under the Act without fear of retribution. Damages can't rectify that harm, and certainly, the Board's ability to rectify that harm diminishes with the passage of time. The Court concludes that absent an injunction ordering reinstatement, irreparable harm will result.

Finding irreparable harm will result absent an injunction, the Court must balance that harm against any harm to the employer. The Company's only argument in this respect is that it will be harmed if forced to reinstate two discharged, substandard employees. The Company described Fosnight and Hensley as "two substandard employees" discharged for insubordination, and referenced Fosnight's prior drug use.[5] The Company further claimed that having to hire back these "disheartened" employees could be harmful with respect to the Company's ability to manage the remaining work force as well as to the customers it serves.

The Court finds these arguments to be unsupported and unpersuasive. Given the Director's strong showing of likely success on the merits, his burden of proving that the balance of harms weighs in his favor is light. The Company's at best minimal harms are far outweighed by the harm to the union and employees' labor effort that would result absent an injunction. In addition, the Company's claim of harm with respect to its ability to manage its work force, including Fosnight and Hensley, is overcome by its legal right to discipline an employee in a nondiscriminatory manner for improper conduct. *Electro-Voice,* 83 F.3d at 1573. Interim

---

[5]Interestingly, the drug use occurred during Fosnight's first term of employment with the Company, for which he was suspended, and later quit. (See Tr. 43, 65, 76). Despite this, by Fosnight's uncontested testimony, the Company later initiated contact with this purported substandard, drug-using former employee for re-hire. (Tr. 127-28). Drug use was not alleged as a reason for Fosnight's termination by any witnesses who testified nor in the termination report in his employee file.

reinstatement, along with the required posting of the Court's decision and injunction, will reassure the employees that their rights under the Act are protected, and ease the chill.

## C. No Adequate Remedy at Law

With the no adequate remedy at law inquiry, the Director must show that an award of damages would be "seriously deficient." *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386-87 (7th Cir. 1984). Prior cases in this circuit indicate that the irreparable harm and no adequate remedy at law inquiries are intertwined. *See Id.* at 1572-73; *Bloedorn,* 276 F.3d at 288. Determining whether irreparable harm outweighing any harm to the employer would result absent an injunction encompasses a finding that a damages award would be deficient, and thus an inadequate remedy at law. As the Court has found above, damages alone will not remedy the harm asserted by the Director with respect to the chilling effect of the Company's conduct, and the Union's right to pursue organizational efforts. Damages alone will not fully restore Fosnight and Hensley to the status quo. Therefore, the Court concludes that there is no adequate remedy at law.

## D. Public Interest

Lastly, the Director must demonstrate that injunctive relief is in the public interest. The public interest "is placed in jeopardy when the protracted nature of the Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices." *Bloedorn*, 276 F.3d at 300. "The public interest is furthered, in part, by ensuring that an unfair labor practice will not succeed because the Board takes a considerable time to investigate and adjudicate the charge." *Electro-Voice,* 83 F.3d at 1572. As discussed, the Director has shown a strong likelihood of success on the merits, and that the passage of time will render any remedy less meaningful. There is no evidence that public harm would result from injunctive relief and

instead the court funds the public interest would be furthered by the grant of an injunction.

### III. Conclusion

For the reasons set forth above, the magistrate judge recommends that the Petition for Preliminary Injunction Under Section 10(j) of the National Labor Relations Act, As Amended, be **GRANTED** as requested by the Regional Director.

11/19/2007

Jane Magnus-Stinson
United States Magistrate Judge
Southern District of Indiana

Distribution:

Michael L. Einterz
EINTERZ & EINTERZ
einterzfirm@aol.com

Kimberly Rose Sorg-Graves
NATIONAL LABOR RELATIONS BOARD
kim.sorg-graves@nlrb.gov

Raifael Worley Williams
NATIONAL LABOR RELATIONS BOARD
raifael.williams@nlrb.gov